THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN DUNNIGAN, JR., Defendant-Appellant.

Third District    No. 80-133

Opinion filed October 27, 1980.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Bringing this appeal from his murder conviction, the defendant, John Dunnigan, Jr., argues that his conviction for murder should be reduced to

involuntary manslaughter where the evidence presented was insufficient to establish, beyond a reasonable doubt, that he acted with the knowledge that his acts created a strong probability of death or great bodily harm to the victim.

The evidence adduced at trial revealed the following sequence of events. The defendant first became acquainted with the victim, Ruby Clash, in July 1976. Prior to December of that year the defendant and Ms. Clash began to live together in Peoria, Illinois, and continued to do so until July 1978, when they quarreled and the defendant left for Wichita, Kansas. In February 1979, the defendant returned to Peoria and resumed his relationship with Ms. Clash. Their relationship soon began to deteriorate, and they argued over whether Ms. Clash was seeing someone other than the defendant. The defendant believed that she was and thought she was trying to get rid of him. The defendant's testimony revealed that he became frustrated during this period of time because Ms. Clash refused to discuss their problems. On one occasion he hit Ms. Clash and then took her to the hospital.

On June 3, 1979, the defendant accompanied Ms. Clash and her sister to Rock Island for the purpose of taking Ms. Clash's grandmother home. During the return trip the occupants of the Clash automobile, which now included the defendant, Ms. Clash, her sister and brother, stopped twice to purchase six packs of beer, part of which the defendant drank while sitting in the back seat of the car. At one point during the drive home the defendant admonished Ms. Clash not to hike up her skirt while driving. He told her that he didn't like a lady who wouldn't follow his rules and that was why they were not going to be together for long.

Upon returning to Peoria, Ms. Clash dropped off her sister and brother, and then agreed to drive the defendant to a place where a friend of his was racing motorcycles. According to the testimony of the defendant's cousin, the defendant stopped by her house at approximately 9:45 p.m. that night and asked for a sharp knife. The cousin gave the defendant a large butcher knife with a wooden handle and told him it was the sharpest she had. After feeling the knife's blade the defendant said it was "just right." The defendant testified that he picked up the knife for the purpose of scaring Ms. Clash.

The defendant directed Ms. Clash to drive to a deserted one-lane road where they had been previously. He testified that he intended to talk to her about their relationship. When they arrived at the designated location Ms. Clash jumped from the car, leaving it in gear. The defendant shifted the car to park, jumped out of the car, chased and grabbed Ms. Clash.

The defendant then threw Ms. Clash to the ground, got on top of her and placed the knife at her throat. He demanded that she tell him the

problem with their deteriorating relationship but she remained silent and, according to the defendant's testimony, twice grabbed the knife and knocked it out of the defendant's hand. The defendant then told her that if she refused to tell him, then she had better "tell Jesus Christ or pray." The defendant then stabbed Ms. Clash, first in the arm, then twice in the chest, the last time leaving the knife buried in her chest. He then became frightened and left. A short time later he turned himself in to the Peoria Police Department, stating that he had killed his girlfriend but that he had only intended to scare her.

Testifying in his own behalf, the defendant stated that he wanted to stab and hurt Ms. Clash just a little but that he had not intended to kill her. On cross-examination he admitted that the knife had not slipped from his hand and that he had a good grip on it. He also admitted swinging the knife at the victim.

The defendant was charged with murder under section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2)), which provides:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death;
>
> * * *
>
> (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another;
> * * *"

Over the State's objection the jury was also given an involuntary manslaughter instruction. Involuntary manslaughter is defined in section 9—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—3(a)) as follows:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly * * *."

■█ The question now before us is whether the jury verdict convicting the defendant of murder is against the manifest weight of the evidence and should be reduced to a conviction of involuntary manslaughter. Where the evidence is conflicting in a homicide case, it is for the jury to decide under proper instructions whether a homicide was murder, manslaughter, or self-defense. (*People v. Davis* (1966), 35 Ill. 2d 55, 61, 219 N.E.2d 468, 471.) It is axiomatic that the jury's determination will not be reversed unless it is contrary to the manifest weight of the evidence. In the present case there was sufficient proof, if believed by the jurors, to justify a conviction of murder.

■█ The presence of three wounds on the victim's body, including two

deep wounds, militates against a finding that the defendant acted merely recklessly, as would be required for a finding of involuntary manslaughter. As this court stated in *People v. Robertson* (1976), 43 Ill. App. 3d 143, 148, 356 N.E.2d 1180, 1184, the presence of multiple stab wounds are themselves enough to negate any possibility that the defendant acted recklessly or unintentionally. Although in *Robertson* five of the six wounds were superficial and the defendant in that case denied killing the victim, we do not believe these factual differences are sufficient to distinguish *Robertson* from the present case and render the general principle announced in *Robertson* inapplicable to the present case.

That the defendant did not intend to kill Ms. Clash is not dispositive of the case, since he must have known that his acts created a strong probability of death or great bodily harm. See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2); *People v. Johnson* (1975), 33 Ill. App. 3d 168, 337 N.E.2d 240.

Accordingly, the judgment of conviction of murder of the Circuit Court of Peoria County is affirmed.

Affirmed.

BARRY and STENGEL, JJ., concur.